We've already been talking a lot about the Patent Office, so now we're back to the Patent Office. My name is Philip Freedman. I'm here before you on an appeal for the final rejection by the Patent Office of our claims relating to a laser surgery device. The final rejections are based on 35 U.S.C. section 103, combinations of six references, and the question here today is, do these six references provide substantial evidence to uphold the Patent Office determination of non-obviousness? Our application is an application for reissue. The original application was filed back in 1995, and our reissue was filed in 2005. So now, reissue. To get right to the issue, I'd like to direct the Court's attention to the claims in the JA, the Joint Appendix. Page 26, Claim 1, which is an independent method claim, and Claim 19, which is an independent device claim, and they appear respectively at JA 26 and JA, at least the relevant portion of the device claim, appears at JA 28. The question here is, and what the aspect of the invention that's important is, a computer comparison of an electronic representation of a patient's cornea compared to a computer representation of a cornea of improved acuity to create an ablation plan. Prior to 1995, the art, the state of the art was that a surgeon would walk into a machine, he would see the patient, he'd have displayed on the screens a number of different parameters, a number of different images, and even templates of surgeries that he had done before. And what he would do would be, from that, he would just, he would devise a plan to ablate the patient's eye. But there was no automatic ablation of the patient's eye from an ablation plan as defined in our claims. And I've directed you to the Joint Appendix, and I'd like to point out the distinguishing claim recitations. And I'd like to start with Claim 19, which is the device claim. By the way, Claim 1 and Claim 19 are the independent claims. All the other claims are dependent from those claims. Well, while you're doing that, and I don't want to cut you off, but your time is limited, if you could really get to the nub of the issue, which is you're challenging the board's findings and conclusions, and we're the board heir, where exactly went awry with respect to the board's analysis? And I'd like to direct your attention to the language of the claim, and where they went awry is that none of these six references, the Nishizawa, the Wade, none of the references teach or suggest, in Redul, teach or suggest this device and this method claim that are dependent upon this language. JA-28, a computer, this is a laser surgery device that's based on a computer that compares an electronic representation of a, and you can read patients because of the, on a CD basis, of the patient's cornea according to light reflected phase difference with an electrical representation. The standard of improved acuity to generate an ablation plan. There's no teaching or suggestion of an ablation plan, and then using at least that kind of ablation plan, and then ablating a patient's eye according to that plan. The method claim is much the same, and I'm applying, there are a number of references in the Patent Office's brief to teachings of the references, starting at page four and five where they talk about Vesperance, and they talk about Sklar, and then at pages, they've mapped the claims at pages four and five. I think it's 14 and 26, 13 and 26, and they try to relate those to this claim language, but if you look at the teachings that they refer to, those teachings are nothing, I don't want to say nothing more, but those teachings are prior art teachings of what a surgeon does. There is no computer comparison in any of the prior art. Indeed, back in 1996, when we filed this case, 1995, when we filed this case, that was the state of the art. The surgeon conducted the surgery, so now, today, there is, there is market items that use what is called the custom cornea, and that's a registered trademark of a company. It's a registered trademark that represents an ablation or a surgical procedure that's based on the patient's cornea, and up until 1995, there was no such procedure. Let's see. I'm just as happy to, if I could, reserve the rest of the time I have and ask the patent office where they believe that these limitations, these claim limitations, are addressed in the prior art. Well, we're fine with your reserving your time. Unfortunately, though, you don't get to ask them any questions. Only we can do that. No, no, I wasn't going to ask questions. But why don't you reserve the balance? You've got a little over eight minutes, so why don't we hear from the patent office? All right, thank you. And I'm sure the questions will be great. May it please the court, with respect to the limitations that were disputed here, the prior art teaches each and every one of them. Lesperanz and Sklar teach that it was well known to perform surgery based on a computer comparison of a patient's cornea with that of an idealized cornea. And based upon that computer comparison, an ablation plan, which is simply a surgical plan, was developed. I have Lesperanz here. Can you tell me what column and line number it discloses? Well, I'd like to start off by pointing you to JA42, and that shows a series of models that walk through the process of ultimately performing the surgery. Starting with model A and then moving right on through model G, you see there that initially the patient's surface of the cornea is measured. And then from there it goes on to B, where the thickness of the cornea is measured. Those two measurements are inserted or entered into the computer module C. And in module D, there's an idealized set of measurements for the cornea. So the computer does a comparison between the measurements of the patient's cornea and the idealized cornea. And based upon that comparison in module G, there is laser surgery that is ultimately performed. And all of that is explained, Your Honor, starting at JA44, column 3, line 40, and it extends through JA46, column 7, line 15. And basically the heart of the comparison takes place at JA45, column 5, starting at about line 34, where it discusses a comparison that's taken place between various measurements of the patient's eye and the idealized eye, which is found in module E. So LusBronce teaches that limitation that Friedman explains is not present in the prior art. It teaches the appellation plan, which is the surgical plan, and it teaches that the surgery that is ultimately being performed is based upon the computer comparison of the patient's eye. And based upon LusBronce and based upon the other references that were applied here, the agency properly found that there was substantial evidence to support the examiner's rejection with respect to Representative Claim 1 and also with respect to Independent Claim 19. Those were the key limitations that opposing counsel raised here. If there are any other questions, I'm happy to entertain them. Your Honor, in the court, referring to JA42 initially, what we have is what we've argued right along, and that is displays and storage, and that's what the computer is used for. B is a CAD CAM display, E is an idealized store topography, and E is examiner's parameter data, and then what 18 does is it represents a surgeon's looking at all this information and conducting his laser surgery. Now, in support, a surgeon makes the determination, and there's a big difference. The surgeon doesn't have the exactness of a computer. A computer has algorithms in it, Foyer, they come up with their precise plan, and it's now the state of the art. And I'd like to direct the court's attention to JA45, column 5, lines 29 to 56, which the Patent Office relies on, and there it says, this feature, and it's referring to the features of the figure 1. You're at JA45, what line number? JA45, column 5, lines 29 to 56, particularly 55 to 58, where it says, this feature permits meridian profile for the idealized to be comparatively evaluated with respect to the display of the meridian profile for the eye. Measured data. And what it teaches is a surgeon looking at the two displays and making a determination from those displays as to what kind of operation plan should be applied. Anything else? I think we have your argument. That concludes the proceedings for this morning. We thank both counsel. The case is submitted. All rise. The oral court is adjourned until tomorrow morning at 10 o'clock a.m.